**In re Carol VERICKER.**

**No. 1092, Docket 71–1656.**

United States Court of Appeals,
Second Circuit.

Argued July 15, 1971.

Decided July 23, 1971.

James Reif and Lewis M. Steel, New York City (Law Center for Constitutional Rights, William Cunningham, S. J., and Doris Peterson, New York City, and diSuvero, Meyers, Oberman & Steel,

New York City, of counsel), for appellant.

Robert L. Keuch, Atty., U. S. Dept. of Justice, Washington, D. C. (Robert C. Mardian, Asst. Atty. Gen., and Edward R. Neaher, U. S. Atty., Eastern Dist. of New York, of counsel), for appellee.

Before FRIENDLY, Chief Judge, and LUMBARD and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

Sister Carol Vericker appeals from an order of the District Court for the Eastern District of New York, Anthony J. Travia, Judge, which found her in contempt for refusing to answer questions before a grand jury sitting in that district and committed her to the custody of the United States Marshal for the life of the grand jury or until such time as she purged herself of the contempt. Although the brief on her behalf advances seven grounds for invalidating the order, we find one of them requires this and therefore need not consider the others.[1]

Sister Vericker was subpoenaed to appear before a grand jury on June 29, 1971, in Brooklyn. On being asked certain questions, she refused on the ground that the answers might tend to incriminate her, as well as on other constitutional grounds. Apparently not disputing the validity of the Fifth Amendment claim, as indeed it scarcely could, see fn. 2, the Government immediately sought a grant of transactional immunity for Sister Vericker under 18 U.S.C. § 2514. The United States Attorney, stating that he was acting with the approval of the Attorney General, made the application for the § 2514 order on the basis of a letter dated June 22, 1971, from the Assistant Attorney General in charge of the Internal Security Division. The application alleged that the grand jury "was then and there inquiring into matters involving violations of Title 18, United States Code, Sections 2314 and 2315, interstate transportation of stolen property; Title 18, United States Code, Section 2071, mutilation of public records; Title 18, United States Code, Section 641, theft of Government property and Title 18, United States Code, Section 371, conspiracy."

Judge Travia promptly signed an order granting immunity and directing Sister Vericker to answer the questions put by the grand jury. On returning to the grand jury room, she again refused to answer, on the same grounds previously advanced. She was immediately brought before the judge and ordered to show cause why she should not be held in contempt. A hearing was held forthwith.

The reporter who had attended the grand jury read the questions Sister Vericker had refused to answer; we set them forth in the margin.[2] After hear-

---

1. Perhaps the most important of these is the claim that the questions propounded by the Government were the result of unauthorized wiretapping of a telephone at Sister Vericker's home. This raises exceedingly difficult statutory and constitutional issues, which have been recently discussed by the Third Circuit in the various opinions of the *in banc* court in In re Egan, filed May 28, 1971. We intimate no views on these issues.

2. Do you have any knowledge of any sort whatsoever available to you concerning the transportation into the Eastern District of New York of stolen FBI documents or copies thereof?

Do you have any knowledge from any source whatsoever available to you concerning the reproduction of stolen FBI documents in the Eastern District of New York?

Have you ever overheard or participated in any conversations at which breaking into any office of the Federal Bureau of Investigation was discussed, and if so, what was said, who said what, where was the conversation and who was present?

Would you name all persons who visted .......... and .......... at the Convent at 149 East 117th Street, New York City, between the dates of May 1 through the 12th, 1971 and if you were present at any discussions between those persons who visited .......... and .........., please state what was said and who said what?

ing argument, the court entered an order of civil contempt. The judge stayed his order to permit an appeal to this court; on this being taken, another panel extended the stay pending an expedited hearing.

Section 2514 of Title 18 authorizes a United States attorney to apply to a district court for a grant of transactional immunity and permits the court to issue such order and direct a witness to testify despite a claim of self-incrimination only "in any case or proceeding before any grand jury or court of the United States involving any violation of this chapter [relating to wire interception and interception of oral communications] or any of the offenses enumerated in section 2516 * * *." It is common ground that, of the subjects of investigation recited in the United States Attorney's application, only 18 U.S.C. §§ 2314 and 2315 are among the offenses listed in § 2516. See 18 U.S.C. § 2516(1) (c). To be sure, it is difficult to comprehend why, for example, Congress thought it proper to authorize the grant of transactional immunity and the consequent compulsion of incriminating testimony when a grand jury is investigating bribery in a sporting contest, 18 U.S.C. § 224, see 18 U.S.C. § 2516(1) (c), but not when it is investigating the theft of Government property from an office of the FBI, 18 U.S.C. § 641, except as the latter might be comprehended by the general statutes prohibiting theft of articles in interstate or foreign commerce or some other named statute, e. g., chapter 37 relating to espionage. Nevertheless, we must take the section as we find it.

■ The only portions of §§ 2314 and 2315 that could conceivably be applicable in this instance are those which make it a crime to transport in interstate or foreign commerce "any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud" or to receive, conceal, store, barter, sell, or dispose of "any goods, wares, or merchandise, securities, or money of the value of $5,000 or more * * * moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken." The questions set forth in footnote 2 make it plain that the property with which the grand jury was concerned was "stolen FBI documents or copies thereof"; indeed, some of the questions related only to an intrastate

What knowledge do you have concerning the burglary, the attempted burglary of the Garden City resident agency of the Federal Bureau of Investigation?

Did you participate in the plans to burglarize the Garden City resident agency of the FBI?

Where do you reside and what is your occupation?

Have you ever overheard or participated in any conversations in which the purchasing or obtaining in any other fashion saws, saw blades or crowbars or other tools were discussed?

What knowledge do you have concerning the burglary, the attempted burglary of the Garden City resident agency of the FBI on or about May 8, 9, 1971?

Where were you on the night of May 8th, 9th, 1971 and who were you with and what was discussed while you were with them and what was said and who said what?

State all occasions during May, 1971 when .......... visited the Convent at 149 East 117th Street, stating who he visited and what was said by whom and who was present?

What is the People's Bureau of Investigation and tell the Grand Jury its purposes, aims and membership?

Have you ever visited, on any occasion, the Garden City resident agency of the FBI?

What is the Citizens Commission to Investigate the Federal Bureau of Investigation and what are its aims and purposes and its membership?

I will ask you have you ever purchased a cyclo device, a masonry drill bit at the Ossining Hardware Company, 75 Croton Avenue, Ossining?

What knowledge do you have of any sources whatsoever available to you concerning a National conspiracy to break into FBI offices to gain knowledge about FBI techniques, informants and so forth in the hope to embarrass the FBI and thwart their investigative techniques?

burglary of an FBI office in Garden City. We do not underestimate the gravity of such an offense and agree that if the grand jury was investigating a crime for which immunity was properly granted, the immunity and consequent duty to testify would extend to testimony concerning offenses not themselves a ground for the grant "insofar as that testimony bears a substantial relation to the subject matter of the immunity provision." United States v. Harris, 334 F.2d 460, 462 (2 Cir. 1964), rev'd on other grounds, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965); United States v. Tramunti, 343 F.2d 548, 552 (2 Cir.), vacated, Castaldi v. United States, 384 U.S. 886, 86 S.Ct. 1906, 16 L.Ed.2d 993 (1965). But a burglary of a government office within the state clearly does not fall within § 2516 and consequently does not afford a ground for granting immunity under § 2514, unless some other provision of the Criminal Code, e. g., espionage, not here alleged, is applicable.

■ If the issue were arising for the first time, some argument could be made that an appropriate recital in an application for immunity that a grand jury was investigating an offense listed in § 2516, if made in good faith, is not subject to challenge by a witness. Having granted immunity and thereby compelled incriminating testimony over the witness' objection, the Government would surely be held to its bargain, cf. Adams v. Maryland, 347 U.S. 179, 181, 74 S.Ct. 442, 98 L.Ed. 608 (1954); and the primary purpose of Congress in limiting the offenses for which immunity could be granted was doubtless to protect the Government against prosecutors making such grants when the game would not be worth the candle.[3] However, it should not be forgotten that the first federal transactional immunity statute to be considered by the Supreme Court did not receive precisely a warm welcome, Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896) [5–4 decision], and a further purpose of Congress in defining offenses with respect to which immunity can be granted and testimony compelled may well have been to protect against what was there characterized in dissent as "[t]he essential and inherent cruelty of compelling a man to expose his own guilt," 161 U.S. at 637, 16 S.Ct. at 655 (dissenting opinion of Mr. Justice Field), even though no criminal punishment can result therefrom, save when Congress had made a policy decision that the public interest so required. See In re Bart, 113 U.S.App.D.C. 54, 304 F. 2d 631, 634–635 (1962). In any event the decisions are virtually unanimous in holding or assuming that the witness may challenge whether the subject matter of a grand jury investigation is consonant with the statutory authorization for the grant of immunity and that, upon such a challenge, the Government must make at least a modest showing that it is. In re Bart, *supra*; Marcus v. United States, 310 F.2d 143, 147–148 (3 Cir. 1962), cert. denied, 372 U.S. 944, 83 S.Ct. 933, 9 L.Ed.2d 969 (1963); United States v. Harris, *supra*, 334 F.2d at 463; Carter v. United States, 417 F.2d 384 (9 Cir. 1969), cert. denied, 399 U.S. 935, 90 S.Ct. 2253, 26 L.Ed.2d 807 (1970); United States v. Di Mauro, 441 F.2d 428, 437–438 (8 Cir. 1971). See also Ullmann v. United States, 350 U.S. 422, 431, 76 S.Ct. 497, 100 L.Ed. 511 (1956). The only opinion cited to us as containing a statement which might indicate that the mere assertion of the United States Attorney suffices is Licata v. United States, 429 F.2d 1177, 1179 (9 Cir. 1970), certiorari granted, judgment vacated and case dismissed as moot, 400 U.S. 938, 91 S.Ct. 239, 27 L.Ed.2d 243 (1970). However, that statement is scarcely impressive authority. It runs counter to the five other cases cited, including the assumption of a different 9th Circuit panel in Carter v. United

3. The drafters of an earlier compulsory testimony act said they wished to make sure it would not "become a loophole for the escape from punishment for the guilty." H.R.Rep.No.2606, 83d Cong. 2d Sess., in 2 U.S.Code Cong. & Admin. News, 83d Cong., 2d Sess., 1954, p. 3062. See also *id.* at pp. 3064 and 3065.

States, *supra,* which the *Licata* court cited with approval on another point, and the judgment was vacated by the Supreme Court without consideration of the merits. In any event, we would be obliged to reject it both for the reason stated at the beginning of this discussion and on the authority of our own decision in United States v. Harris, *supra.*

We thus come to the question whether the Government made even the required modest showing that the grand jury was investigating the transportation, receipt, or sale of "goods," "wares," or "merchandise" having a value of $5,000 or more in or from interstate or foreign commerce. It is quite true that under some circumstances mere papers may constitute "goods," "wares," or "merchandise." The Third Circuit has so held with respect to geophysical maps, United States v. Seagraves, 265 F.2d 876 (3 Cir. 1959), and United States v. Lester, 282 F.2d 750 (3 Cir. 1960), cert. denied, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed. 2d 368 (1961), and we have done so with respect to documents describing procedures for manufacturing certain antibiotic drugs and a steroid from microorganisms, United States v. Bottone, 365 F.2d 389, 393 (2 Cir. 1966), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966). But such papers were well within the normal meaning of goods, wares, or merchandise, "a general and comprehensive designation of such personal property or chattels as are ordinarily a subject of commerce," 265 F.2d at 880. Geophysical maps are an ordinary subject of sale by geologists or oil companies, and secret manufacturing procedures are an ordinary subject of sale or, more frequently, of license. See Painton & Co., Ltd. v. Bourns, Inc., 442 F.2d 216 (2 Cir. 1971), and Milgrim, Trade Secrets § 1.06 (1970). We are not aware that papers showing that individuals are or may have been engaging in criminal activity or what procedures are used by the FBI in tracking them down are ordinarily bought or sold in commerce, and the Government has not come forward or proffered any evidence to that effect. Although the Government refers to passages in the legislative history where the proponents of the bill, an amendment of the National Motor Vehicle Theft Act, expressed an intention to cover "all property," appellant relies on the same history to show that Congress was aiming at the kind of property normally the subject of theft by gangsters and racketeers. Under such circumstances, we must give the words actually used their ordinary meaning. As Mr. Justice Holmes said of an earlier form of this statute, "Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). For the purposes of this case it is no matter that the acts would have been criminal under other statutes not within the permissible grant of immunity. Nothing in the questions asked of Sister Vericker would indicate that the grand jury was investigating anything else that might come within §§ 2314 or 2315, or any other crime with respect to which immunity could be granted, and the Government has made no suggestion of that sort.

So far as this aspect of the case is concerned, it is regrettable that the judgment of contempt must be vacated although immunity could validly have been granted if the grand jury had been investigating considerably less serious crimes. But the remedy for what seems a legislative oversight lies with the legislature, not in a court's broadening the language that Congress used.

The judgment of civil contempt is vacated.