UNITED STATES of America,
Plaintiff-Appellee,

v.

Ralph E. SMITH, d/b/a Televideo
Corporation, Defendant-Appellant.

No. 80–2076.

United States Court of Appeals,
Fifth Circuit.

Sept. 2, 1982.
Rehearing Denied Nov. 3, 1982.

Gerald M. Birnberg, Houston, Tex., for defendant-appellant.

James R. Gough, James L. Powers, Daniel T. Kamin, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before COLEMAN, REAVLEY and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Defendant, Ralph E. Smith, d/b/a Televideo Corporation (Televideo), was indicted for offenses allegedly arising out of his distributing copies of copyrighted works in interstate and foreign commerce. The indictment charged 227 counts. Counts 1–218 charged defendant with misdemeanor offenses of willfully infringing for profit a copyright by violating the copyright own-

er's exclusive rights to distribute copies of the copyrighted work to the public, in violation of 17 U.S.C.A. §§ 106(3) and 506(a). Counts 219–227 charged defendant with felony offenses of transporting stolen goods in interstate or foreign commerce in violation of the National Stolen Property Act (NSPA), 18 U.S.C.A. § 2314.

Defendant Smith filed a Motion to Suppress certain evidence, alleging that damaging video cassettes had been obtained from him in violation of the fourth amendment to the United States Constitution. This motion was denied. In addition, Smith moved the district court to dismiss the felony counts, arguing that interstate transportation of materials obtained in violation of the copyright laws does not come within the ambit of the NSPA. This motion was also denied.

Several counts of the indictment were dismissed, however. The case was tried to a jury on thirty-four counts—each representing an individual film—of misdemeanor copyright infringement and two felony counts of interstate transportation of stolen goods. The jury found Smith guilty of all counts.

On the misdemeanor copyright infringement convictions, the district court sentenced Smith to one year in prison and imposed a fine of $25,000 for each of the counts numbered 5, 22, 26 and 33, "said sentences to be consecutive to each other." As to each of the remaining misdemeanor counts, the court sentenced defendant to one year in prison and imposed a fine of $25,000 "concurrent with each other and concurrent with the sentences imposed as to Counts 5, 22, 26 and 33." On the felony convictions, the court sentenced defendant to four years in prison for each of the two felony counts. These sentences were imposed to run "concurrent with each other and concurrent with the sentences imposed as to Counts 5, 22, 26 and 33."

Defendant Smith appeals his conviction and the resulting sentences. This Court affirms his misdemeanor copyright infringement convictions. However, the Court reverses Smith's convictions as they relate to the two felony counts.

## I. Facts

The relevant facts of this case arise out of activity beginning in early 1976. At that time, defendant Smith began recording and duplicating on video cassette tapes the television portrayal of motion pictures, sporting events, and other broadcast features. The recordings were edited to delete commercial advertising and station identifications. Additionally, the quality of the recordings was technically enhanced. Defendant Smith then mass produced additional copies and distributed them to offshore drilling platforms. This distribution was accomplished by rental contracts with oil companies, drilling companies, and similar customers.

The Federal Bureau of Investigation (FBI) began investigating Smith's activities in 1978. In September of that year, Smith discovered there was an ongoing grand jury investigation of his activity. He learned that, as part of the investigation, the grand jury had subpoenaed the records of some of his customers. As a result, Smith directed one of his employees, Fernando Cordona, to lease a rental truck and begin the operation of removing records, tapes, and other belongings from the Televideo business premises to defendant Smith's residence. A truckload of the materials was transported to Smith's residence, where it remained for some five days. At this time, Smith directed that the truck, together with its contents, be taken to Cordona's home. At approximately 10:00 p.m. on September 19, 1978, Smith directed, by telephone, that the truck and its contents be brought to the Smith residence once again.

During this time, another employee of Televideo informed the FBI about the rental truck and the activity of Smith and Cordona. The employee-informant indicated the truck had been loaded with materials and taken to Smith's residence. The employee told the FBI that once the tapes were at Smith's residence, many of them had been magnetically erased and their labels removed and burned. As a result of this information, FBI agents maintained

surveillance of the truck. This led to the FBI's seizure of the vehicle on September 19, 1978, as it was being returned to Smith's residence from Cordona's.

After seizure of the vehicle, and while it was being driven to the Federal Building, the FBI agents presented a United States magistrate with an affidavit and request for a warrant to search the truck. This warrant was obtained at approximately 2:06 a.m. on September 20, 1978. Subsequently, the vehicle was searched.[1]

Based upon these facts, defendant Smith claims two issues mandate reversal of his convictions, at least in part. Defendant Smith argues the district court erred by not ruling that the search of the boxes, files, and cartons contained in the seized rental truck violated the fourth amendment of the United States Constitution. Defendant argues he had a reasonable expectation of privacy in the materials, and that the warrant allowing the search and seizure was an invalid general warrant. Defendant Smith also argues the district court erred by refusing to dismiss the felony counts of the indictment. Defendant Smith argues this refusal was erroneous because the interstate transportation of materials acquired in violation of the copyright laws does not come within the proscriptions of the NSPA.

## II. *The Search Warrant*

Defendant Smith claims the district court erred in ruling that the search of the objects contained in the seized truck did not violate his fourth amendment rights.[2] The basis of Smith's argument is that it was error for the district court to find that "[t]he diminished expectation of privacy which surrounds the truck and the exigent circumstances present justified the search."

 Smith's position is ill-conceived. The district court's conclusion regarding a diminished expectation of privacy was unnecessary, since the search of the rental truck was made pursuant to a valid warrant. However, defendant Smith also contends the search warrant authorizing the search and seizure of the truck's contents was impermissibly general. Of course, it is fundamental that a search warrant may not be a general warrant.

The warrant challenged in the case *sub judice* was not impermissibly general. The warrant directed the seizure of the following described property:

> recorded video tapes, electronic video recording and play back equipment. Documents pertaining to the commercial rental and leasing of recorded video tapes onto which have been electronically transferred and recorded copyrighted motion picture photo plays. Said recorded video tapes are willfully being used to infringe the copyrights of those motion picture photo plays for purposes of commercial advantages and private financial gain and said recorded video tapes contain copyrighted motion picture photo plays which have not been the subject of first sales by the copyright owners and said video tapes, equipment and documents which reflect business transactions concerning said video tapes and equipment are violation [sic] of Title 17, United States Code, Sections 1 and 104 and the January 1, 1978 Copyright Act, Title 17, United States Code, Sections 501, 506, and 509.

The warrant declared the affiant had reason to believe the property was being concealed in:

> A vehicle described as a "Ryder" Rental Truck approximately 18′ in length, yellow in color, bearing truck identification number 20358 with a Georgia License plate on the rear of the vehicle bearing tag num-

---

1. The record indicates the agents received two additional warrants to search the Televideo premises. The subsequent search resulted in a comprehensive seizure. However, as a result of defendant's motion pursuant to Fed.R. Crim.P. 41(e), a district court declared the warrants allowing a search of the premises to be invalid general warrants and the items seized from the premises were returned.

2. Smith does not challenge the warrantless seizure of the rental truck, but argues the subsequent search, although made pursuant to a warrant, violated his fourth amendment rights.

ber JA2082 and a Massachusetts License plate on the front of the vehicle bearing tag number BB14128.

■ Under the circumstances, the search warrant was not constitutionally flawed. Assuming probable cause has been shown, the warrant may be sufficient with only a generic description, if a more specific description of the things to be seized is unavailable. *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981) and cases cited therein. The affidavit submitted to the magistrate provided sufficient facts and evidence to reasonably establish probable cause to believe *all* of the recorded video tapes and electronic video recording and playback equipment contained in the truck was related to the criminal violation of the copyright laws.[3]

■ As a result, a more specific description of the things to be seized was unnecessary. Since there was probable cause to believe the entire contents of the truck was illegal, the warrant—in allowing seizure of recorded video tapes and electronic video recording and playback equipment—was sufficiently particular so that "nothing [was] left to the discretion of the officer[s] executing the warrant."[4] *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965) *quoting Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); *see also Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976).

■ In addition, the description of "Documents pertaining to the commercial rental and leasing of recorded video tapes onto which have been electronically transferred and recorded copyrighted motion picture photoplays," was not so general as to render the warrant constitutionally infirm. The documents to be seized in the execution of the warrant were those specifically described as "pertaining to" the crimes committed with the recorded video tapes and electronic video recording and playback equipment. Accordingly, no impermissible discretion regarding what documents were to be seized was granted those executing the warrant.

In summary, the warrant, which was based upon sufficient probable cause, authorized a search and seizure of all videotapes and videotape equipment in the rental truck, as well as any documents pertaining to the alleged copyright infringement. As such, the warrant adequately limited the discretion of those executing it. The district court did not err in denying defendant Smith's Motion to Suppress.

### III. The NSPA Section 2314 Felony Counts

■ The NSPA section 2314 provides, "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud, . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both." As noted, defendant Smith was convicted under the provisions of the NSPA section 2314, and he was sentenced pursuant to section 2314's felony punishment provisions. The foundation for the felony convictions, and the Government's position in the case *sub judice*, is that taping copyrighted works "off the air" and then distributing the works in interstate or foreign commerce in violation of a copyright owner's exclusive distribution rights triggers the provisions of section 2314.

Defendant Smith stipulated facts sufficient to establish copyright infringement under section 106(3) of the Copyright Act of 1976, 17 U.S.C.A. § 101 *et seq.* Smith further stipulated that he transported and caused the copies he had made "off the air" to be transported in interstate and foreign

---

3. The magistrate's conclusions regarding probable cause to issue a warrant are entitled to great deference. *United States v. Allen*, 588 F.2d 1100, 1105–06 (5th Cir. 1979), *modified on different grounds*, 593 F.2d 709 (5th Cir. 1979).

4. Further, because the video tapes were not only great in number, but apparently in various states of being erased and having their labels removed, a more specific description of the things to be seized appears to have been unavailable.

commerce. Smith contends, however, that his copyright infringement is not the equivalent of having "stolen, converted, or taken by fraud" as that phrase is used in the NSPA section 2314. He also contends that copyrights are not "goods, wares, [or] merchandise," such that the provisions of the NSPA are implicated. After an examination of section 2314's language and history, this Court agrees that, at least under the facts of the case *sub judice*, copyright infringing activity is not covered by section 2314.

### A. The Statutory Language of Section 2314

■ Determination of whether Congress intended for the NSPA section 2314 to apply in cases of copyright infringement is a sensitive inquiry at best. It implicates the constitutional concerns of separation of powers, since significant potential exists for a court to encroach upon Congress' lawmaking prerogative. It is for Congress to say what shall be a crime and how that crime shall be punished; it is not the prerogative of this Court. Consequently, since "[s]ection 2314 is a criminal statute '. . . [it] must be strictly construed.'" *Merrill v. United States*, 338 F.2d 763, 770 (5th Cir. 1964) quoting *Prussian v. United States*, 282 U.S. 675, 677, 51 S.Ct. 223, 224, 75 L.Ed. 610 (1931).

In order to interpret section 2314 strictly and correctly, this Court must look first to the language of the statute. Determining whether copyright infringement by unauthorized distribution falls within the ambit of transporting goods, wares, or merchandise that have been stolen, converted, or taken by fraud requires an examination and interpretation of section 2314's terms in their usual or common sense. *United States v. Williams*, — U.S. — at —,

102 S.Ct. 3088 at 3088, 73 L.Ed.2d 767; *Merrill*, 338 F.2d at 769. "And, when interpreting a criminal statute [such as the NSPA section 2314] . . . we are reluctant to base an expansive reading on inferences drawn from subjective and variable 'understandings.'" *Williams*, — U.S. at —, 102 S.Ct. at 3092.

■ This Court determines, therefore, it simply is not at liberty to find that the rights associated with copyright ownership are within the usual or common sense meaning of the phrase "goods, wares, [or] merchandise." The Copyright Act of 1976 provides a concrete understanding of what the term "copyright" means.[5] Section 101 of the 1976 Act defines a copyright owner by referring to the exclusive rights that the owner enjoys. Section 101 states that a "'[c]opyright owner', with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right." As a result, the Court must turn to the Act's list of "exclusive rights," which is provided in section 106. Section 106(3)—the section utilized in defendant Smith's indictment and mirrored in the district court's "Judgment and Probation/Commitment Order"—provides "the owner of copyright under this title [with] the exclusive rights . . . to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."

■ As the term itself suggests, and the definitions confirm, a copy*right* is nothing more than an incorporeal, intangible right or privilege to engage in or to authorize certain activity. Indeed, section 202 of the Copyright Act states:

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.

---

**5.** Black's Law Dictionary 304 (rev. 5th ed. 1979) provides a specific definition of the term copyright. It defines copyright as:

The right of literary property as recognized and sanctioned by positive law. An intangible, incorporeal right granted by statute to the author or originator of certain literary or artistic productions, whereby he is invested,

for a limited period, with the sole and exclusive privilege of multiplying copies of the same and publishing and selling them.

As will be demonstrated, this definition is consistent with and adds weight to this Court's ultimate determination that an intangible, incorporeal right or privilege is not the equivalent of § 2314's goods, wares, or merchandise.

Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.[6]

Consequently, a "copyright", together with the exclusive rights and privileges associated with the copyright, does not implicate any tangible embodiment of the work.[7] Additionally, ownership of a copyright does not encompass ownership of the words, sounds, pictures, or images embodied in the tangible object. In other words, a copyright is independent of both its physical manifestation and the very thing that is copyrighted. *United States v. Bottone*, 365 F.2d 389, 393 (2nd Cir. 1966); *Local Trademarks, Inc. v. Price*, 170 F.2d 715, 718 (5th Cir. 1948); *King Brothers Productions, Inc. v. RKO Teleradio Pictures, Inc.*, 208 F.Supp. 271, 277 (S.D.N.Y.1972).

■ The common or usual meaning of the phrase "goods, wares, [or] merchandise" is not sufficiently broad to encompass an incorporeal, intangible right or privilege. In reaching its conclusion, this Court utilizes a two-tiered analysis. First, it examines general dictionary definitions of the phrase "goods, wares, [or] merchandise." Second, it turns to other courts' specific interpretations of section 2314.

Initially, a general dictionary definition reveals that a necessary element of goods, wares, and merchandise is that the item have a tangible existence. Black's Law Dictionary 624 (rev. 5th ed.) has a specific listing for the phrase "goods, wares, and merchandise." The listing defines the phrase as "[a] general and comprehensive designation of such chattels and goods as are ordinarily the subject of traffic and sale." In turn, a "chattel" is defined as "[a]n article of personal property, as opposed to real property. A thing personal and moveable. It may refer to animate as well as inanimate property." *Id.* at 215. Black's defines the term "goods" as including "every species of personal property or it may be given a very restricted meaning. [It includes] [i]tems of merchandise, supplies, raw materials, or finished goods. Sometimes the meaning of 'goods' is extended to include all tangible items, as in the phrase 'goods and services.' " *Id.* at 624.[8]

Examination of the contrast between the meaning of copyright ownership and the general dictionary definitions of goods, wares, or merchandise reveals a significant difference. Very simply, an incorporeal, intangible right or privilege to engage in or to authorize certain activity is not generally considered to be goods, wares, or merchandise. The phrase goods, wares, or merchandise connotes tangible items; something tangible has or possesses physical form.[9]

Specific interpretations of section 2314 confirm this general conclusion. The Third

6. Defendant Smith correctly points out that § 27 of the predecessor Copyright Act of 1909 contained a precisely equivalent provision.

7. *See* 17 U.S.C.A. § 102 for the General Subject Matter of Copyrights.

8. In providing a definition of the term "goods," Black's helpfully refers to definitions found in the Uniform Commercial Code:
 All things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action. Also includes the unborn of animals and growing crops and other identified things attached to realty as fixtures. U.C.C. § 2–

105(1). All things treated as moveable for the purposes of a contract of storage or transportation. U.C.C. § 7–102(1)(f).
 As used with reference to collateral for security interests, goods include all things which are moveable at the time the security interest attaches or which are fixtures. Section 9–105(1)(h) of the 1972 U.C.C.; Section 9–105(1)(f) of the 1962 U.C.C.
Black's at 624.

9. Black's defines the term "tangible" as "[h]aving or possessing physical form. Capable of being touched and seen; perceptible to the touch; tactile; palpable; capable of being possessed or realized; readily apprehensible by the mind; real; substantial." Black's at 1305.

Circuit case of *United States v. Seagraves,* 265 F.2d 876 (3rd Cir. 1959), provides the most recognized definition of section 2314's phrase "goods, wares, [or] merchandise." In that case, the court looked to what has been described as the "normal, ordinary and logical import of the statutory language." *United States v. Greenwald,* 479 F.2d 320, 322 (6th Cir. 1973), *cert. denied,* 414 U.S. 854, 94 S.Ct. 154, 38 L.Ed.2d 104. It concluded that the phrase goods, wares, or merchandise means "a general and comprehensive designation of such personal property or chattels as are ordinarily a subject of commerce." *Seagraves,* 265 F.2d at 880.

The *Seagraves* definition creates a two part test for determining whether something is a good, ware, or merchandise for purposes of the NSPA section 2314. The first part of the test is consistent with the general dictionary definition of goods, wares, or merchandise. The "thing" or "item" must have some sort of tangible existence; it must be in the nature of "personal property or chattels." This part of the test is also consistent with the need to read statutory language strictly and in its usual or common sense. Such a test explains and justifies the Second Circuit's statement that "[t]o be sure, where no tangible objects were ever taken or transported, a court would be hard pressed to conclude that 'goods' had been stolen and transported within the meaning of § 2314." [10] *United States v. Bottone,* 365 F.2d 389, 393 (2nd Cir. 1966). *See also Greenwald,* 479 F.2d at 322; *In re Vericker,* 446 F.2d 244, 248 (2nd Cir. 1971); *American Cyanamid Co. v. Sharff,* 309 F.2d 790, 796 (3rd Cir. 1962); *Italiani v. Metro-Goldwyn Mayer,* 45 Cal.App.2d 464, 114 P.2d 370 at 372 (holding that literary property, such as a copyright, "certainly does not come under the designation of 'goods and chattels.'").

The second prong of the *Seagraves* test involves the determination of whether the personal property or chattels are ordinarily a subject of commerce. *Seagraves* and its progeny indicate that items may be in the nature of personal property or chattels, but fail to meet section 2314 requirements because they are not bought and sold. *See In re Vericker,* 446 F.2d at 248; *American Cyanamid Co. v. Sharff,* 309 F.2d at 796. Likewise, an item, such as a copyright, may be something commonly bought and sold, but it is not a good, ware, or merchandise within the purview of section 2314 because it is not in the nature of personal property or chattels.

A normal, ordinary, and logical reading of the language of section 2314 precludes the determination that a copyright—which is an incorporeal, intangible right or privilege existing independent of both its physical manifestation and the very thing copyrighted—is a good, ware, or merchandise such that the felony provisions of the NSPA are implicated. While copyrights arguably may be subjects of commerce, they are not usually or commonly considered to be goods, wares, or merchandise. [11]

Likewise, examination of both the general meaning of the phrase "stolen, converted, or taken by fraud," and other courts' interpretations of that meaning, reveals that this Court is not at liberty to find that copyright infringement—at least the infringement involved in the case *sub judice* —is the equivalent of stealing, converting, or taking by fraud. Defendant Smith was indicted and convicted for violating the exclusive right of copyright owners to distribute copies of their copyrighted work. As noted, Smith obtained copies of the copy-

---

**10.** The Second Circuit continued, "the statute would presumably not extend to the case where a carefully guarded secret formula was memorized, carried away in the recesses of a thievish mind and placed in writing only after a boundary had been crossed." *Bottone,* 365 F.2d at 393.

**11.** This analysis is given added weight when the remaining language of § 2314 is examined. Whether the thing transported in interstate commerce was "stolen, converted, or taken by fraud" is inextricably tied to whether the thing is a good, ware, or merchandise. This is a function of the usual and common sense meaning of the terms stolen, converted, or taken by fraud.

righted works by taping broadcasts "off the air." It is difficult to determine whether the Government perceives the copying "off the air" to be the equivalent of stealing, converting, or taking by fraud or whether it perceives the distribution itself to be stealing, converting, or taking by fraud. It is notable, however, that defendant Smith was not indicted for the "off the air" copying; the only complaint was against his distribution.

In any event, neither activity is encompassed by the usual or common sense meaning of "stolen, converted, or taken by fraud." At the outset, Black's Law Dictionary points out that the term "steal"

is commonly used in indictments for larceny ("take, *steal*, and carry away"), and denotes the commission of theft, that is, the felonious taking and carrying away of the personal property of another, and without right and without leave or consent of the owner, and with intent to keep or make use wrongfully... Or, it may denote the criminal taking of personal property either by larceny, embezzlement, or false pretenses. But, in popular usage "stealing" may include the unlawful appropriation of things which are not technically the subject of larceny, *e.g.*, immovables.

Black's at 1267 (emphasis in original) (citations omitted). This general definition involves several factors. First, it contemplates a removal or moving of something. Second, it indicates the something that is removed is the same type of thing considered to be a good, ware, or merchandise; it must be a tangible. Finally, the definition of steal contemplates that whatever is

removed is actually owned or in someone's possession.

The general dictionary definition of the word "conversion" echos these three factors. Conversion is defined as:

An unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights. Any unauthorized act which deprives an owner of his property permanently or for an indefinite time. Unauthorized and wrongful exercise of dominion and control over another's personal property, to exclusion of or inconsistent with rights of owner.

*Id.* at 300. Finally, the dictionary definition of the term "take," is similar.[12] "Take" is to lay hold of; to gain or receive into possession; to seize; to deprive one of the use or possession of; to assume ownership." *Id.* at 1303.[13]

Without question, the general dictionary definition of the phrase "stolen, converted, or taken by fraud" implicates the removal or taking possession of a tangible item that is owned by or in the possession of someone else. This general interpretation is supported by specific interpretations of section 2314. To illustrate, the cases of *Bottone* and *Seagraves* both demonstrate the need for a removal or transporting of items from someone else's possession. This element is necessary even if the removal of the original item was temporary, and the item was later returned. See *Bottone*, 365 F.2d at 393.[14] Additionally, *Bottone* indicates that

---

**12.** Technically speaking, there are no allegations that the copyrighted works in the case *sub judice* were "taken by fraud." It is helpful, however, to examine the common meaning of the term "take" in order to obtain a full comprehension and feeling for what the language of section 2314 means.

**13.** Black's provides further explanation:

The word "take" has many shades of meaning; the precise meaning which it is to bear in any case depending upon the subject with respect to which it is used.

In the law of larceny, to obtain or assume possession of a chattel unlawfully, and with-

out the owner's consent; to appropriate things to one's own use with felonious intent. Thus, an actual *taking* is essential to constitute larceny. A "taking" occurs when a person with a preconceived design to appropriate property to his own use obtains possession of it by means of fraud or trickery. Black's at 1303–04 (emphasis in original).

**14.** The Government points to the Second Circuit's statement that "when the physical form of the stolen goods is secondary in every respect to the matter recorded in them, the transformation of the information in the stolen papers into a tangible object never possessed by

section 2314's provisions regarding theft and taking contemplate tangible items. *Id.* at 393–94. Finally, in interpreting section 2314, courts have made clear that the term stealing is "essentially an offense against another person's proprietary or possessory interests in property." *United States v. Long Cove Seafood, Inc.,* 582 F.2d 159, 163 (2nd Cir. 1978); *United States v. McClain,* 545 F.2d 988, 1000–03 (5th Cir. 1977).

There can be no question that copyright infringement by the unauthorized distribution of copies is not stealing, converting, or taking by fraud, if the statutory phrase is given its normal, ordinary, and logical import. Defendant Smith's acts of distribution did not involve the removal or moving of any tangible item from another's possession. Distribution is not normally, ordinarily, or logically the equivalent of removal. Additionally, nothing that was distributed was owned or possessed by the copyright owners. The copyright owners not only had no interest in the tangible video cassettes that contained copies of the works, but they did not have the exclusive right to possess or authorize possession of video cassettes containing copies of the works. They also did not own the intangible images contained in the cassettes. Copyrights exist separate and apart from anything defend-

ant Smith took across interstate lines. At most, the distribution denied the copyright owners the privilege of controlling distribution, which is an incorporeal, intangible right.

Additionally, the taping of copies "off the air" is not the equivalent of stealing, converting, or taking by fraud. Taping "off the air" does not implicate a tangible item. It involves the taping of a series of images onto cassettes owned and possessed by defendant Smith. Additionally, nothing was removed from someone's possession. As noted, the owners of the copyrights involved in the case *sub judice* owned no possessory interests in the images.[15] The owners of the copyrights only had the exclusive right or privilege to control distribution of the copyrighted works.[16]

█ While section 2314 is broad enough to encompass more than common-law larceny, *United States v. Long Cove Seafood, Inc.,* 582 F.2d at 163–64, makes clear that not all wrongful acquisitions are the equivalent of the NSPA section 2314's stealing, converting, or taking by fraud. To hold that stealing, converting, or taking by fraud means any acquiring of something in violation of law would unacceptably expand the scope of section 2314.[17] *See Williams,*

the original owner should be deemed immaterial," as authority for its position that defendant Smith's taping off the air may amount to theft. However, the Second Circuit's statement must be read in context. In context, one finds the court was making the point that, once the original *tangible* is moved, it may be transformed into a new form and still be stolen within the meaning of § 2314. The court made clear that it would be hard pressed to find something intangible to be stolen. *Bottone,* 365 F.2d at 393–94.

**15.** As a legal and practical matter, the images were dedicated to the public. *Teleprompter Corp. v. Columbia Broadcasting Systems, Inc.,* 415 U.S. 394, 94 S.Ct. 1129, 1138, 39 L.Ed.2d 415 (1974).

**16.** Of course, the exclusive power to control or regulate an object does not constitute ownership of the object itself. *See United States v. McClain,* 545 F.2d at 1002.

**17.** Of course, in reaching its conclusion, this Court recognizes the previous pronouncements

of this Court and other courts, that copyright infringement is neither the equivalent of "conversion," *Local Trademarks, Inc. v. Price,* 170 F.2d at 718 (5th Cir. 1948); *King Brothers Productions, Inc.,* 208 F.Supp. at 277; *Italiani,* 114 P.2d 369, nor the equivalent of "taking" in the constitutional sense, *Porter v. United States,* 473 F.2d 1329, 1337 (5th Cir. 1973) citing *Twentieth Century Fox Film Corp. v. Dieckhaus,* 153 F.2d 893 (8th Cir. 1948) and *Turton v. United States,* 212 F.2d 354 (6th Cir. 1954).

This Court also acknowledges the cases that suggest § 2314 may encompass copyright infringement. However, this Court determines the cases are distinguishable from the case *sub judice.* None of the cases that have mentioned the relationship between the NSPA section 2314 and copyright infringement have addressed the troublesome issue in the case *sub judice*—whether taping copyrighted works "off the air" and then violating the copyright holder's exclusive distribution rights falls within the ambit of § 2314.

To illustrate, in the cases of *United States v. Atherton,* 561 F.2d 747 (9th Cir. 1977) and

—— U.S. at ——, 102 S.Ct. at 3092. The distribution in interstate or foreign commerce in violation of a copyright owner's exclusive distribution rights of copyrighted works, which have been taped "off the air" is not normally, ordinarily, or logically stealing, converting, or taking by fraud.

In summary, the language of section 2314, when read in its general or common sense, precludes this Court's finding that the particular activity of defendant Smith implicated the felony provisions of section 2314. To so hold, would seriously encroach upon Congress' lawmaking prerogative.

B. *History of the NSPA Section 2314*

The history of the NSPA provides further justification for this Court's refusal to apply section 2314 in the case *sub judice*. Examination of the history and purpose of the NSPA reveals Congress never considered copyright infringement and compels a determination that Congress never intended for copyright infringement to be covered by the NSPA.

The NSPA was an extension of the National Motor Vehicle Theft Act, 18 U.S.C.A. § 2312 (NMVTA), which was passed in re-

sponse to the growing number of automobile thefts in the United States. The Supreme Court, in *United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), provided a succinct description of the need for the NMVTA:

> By 1919, the law of most States against local theft had developed so as to include not only common-law larceny but embezzlement, false pretenses, larceny by trick, and other types of wrongful taking. The advent of the automobile, however, created a new problem with which the States found it difficult to deal. The automobile was uniquely suited to felonious taking whether by larceny, embezzlement or false pretenses. It was a valuable, salable article which itself supplied the means for speedy escape. "The automobile [became] the perfect chattel for modern large-scale theft." This challenge could be best met through use of the Federal Government's jurisdiction over interstate commerce. The need for federal action increased with the number, distribution and speed of the motor vehicles until, by 1919, it became a necessity. The result was the National Motor Vehicle Theft Act.[18]

---

*United States v. Drebin*, 557 F.2d 1316 (9th Cir. 1977), the evidence at trial demonstrated that the original works had been stolen and used to make copies. In *United States v. Bottone*, 365 F.2d 389, the § 2314 charges arose from the initial removal of documents, copying of the documents, and the subsequent return of the originals. Without holding that this Circuit would consider such activity to be stealing, converting or taking by fraud of goods, wares, or merchandise within the meaning of § 2314, this Court notes the distinguishing factor that, at least for a time, there was a removal of a tangible item from its owner's possession. Of course, in *Seagraves* and *United States v. Lester*, 282 F.2d 750 (3rd Cir. 1960) the items that were transported in interstate commerce were those actually removed from the owner's possession.

This Court also notes that *United States v. Berkwitt*, 619 F.2d 649, 650 (7th Cir. 1980) and *United States v. Whetzel*, 589 F.2d 707 (D.C. Cir.1978) are both less than helpful in the case *sub judice* because their suggestion that § 2314 applies to copyright infringing activities is made with little or no explanation and either by implication or in *dictum*. *See also United States v. Sam Goody, Inc.*, 506 F.Supp. 380 (E.D.N.Y.1981) (new trial subsequently granted

on other grounds, 518 F.Supp. 1223 (1981)). *But Cf. Local Trademarks, Inc. v. Price*, 170 F.2d at 718 (5th Cir. 1948).

18. The Supreme Court, in *Turley*, referred in great detail to the House report that accompanied the bill. The report significantly aids in an understanding of the purpose of the NMVTA:

> The Congress of the United States can scarcely enact any law at this session that is more needed than the bill herein recommended, and that has for its purpose the providing of severe punishment of those guilty of the stealing of automobiles in interstate or foreign commerce. * * * State laws upon the subject have been inadequate to meet the evil. Thieves steal automobiles and take them from one State to another and ofttimes have associates in this crime who receive and sell the stolen machines. * * * "The purpose of the proposed law is to suppress crime in interstate commerce. Automobiles admittedly are tangible property capable of being transmitted in interstate commerce. The larceny of automobiles is made a crime under the laws of all the States in the Union. No good reason exists why Congress, invested with the power to regulate com-

*Id.* 77 S.Ct. at 400 *quoting* Hall, *Theft, Law and Society* (2d ed. 1952).

This explanation of the NMVTA is helpful because it illustrates the foundation on which the NSPA grew. This foundation had at least three elements. First, Congress was attempting to aid states in their local law enforcement. To do so, Congress had to make the interstate transportation of stolen automobiles a federal crime. Of course, the commerce clause provided Congress with the appropriate jurisdiction to do so. Second, the legislation was directed at tangible chattels. Third, the stealing or theft of the automobiles was discussed in the conventional terms—removal of tangible property from the owner's possession.

The NSPA was meant to extend the NMVTA. In fact, one of the bills that lead to the NSPA's enactment, S.B. 2845, was labeled "An Act to Extend the Provisions of the National Motor Vehicle Theft Act to Other Stolen Property." The legislative history of the NSPA demonstrates that it was built upon basically the same premise as the NMVTA. Senator Ashurst, when introducing the NSPA, explained its purpose and the need for it by reading a letter from the United States Attorney General, Homer Cummings:

> In the preparation and submission of these bills, careful consideration has been given to the manner in which the Federal Government can most effectively perform its duty in the suppression of crime, particularly the more vicious crimes of violence which have of recent years grown to extensive proportions. I have attempted to keep in mind the fundamental principle of law enforcement—that generally the suppression of crime is the obligation of the various States and local political subdivisions. It is, of course, on this theory that the structure of our form of government was erected and there is no intention to do violence to this principle. However, the recent growth of certain types of crime has brought forcibly to our attention the fact that criminals engaged therein are not under adequate control... [C]riminals have made full use of the improved methods of transportation and communication, and have taken advantage of the limited jurisdiction possessed by State authorities in pursuing fugitive criminals, and of the want of any central coordinating agency acting on behalf of all of the states. In pursuing this class of offenders, almost inevitably breakdown of law enforcement results from this want of some coordinating and centralized law enforcement agency. Observations of officials of the Department of Justice engaged in law enforcement have caused them to conclude that although the local authorities are generally honest, alert, and efficient, the territorial limitations on their jurisdiction prevent them from adequately protecting their citizens from this type of criminal.

78 Cong.Rec. 2947 (1934) (Remarks of Homer Cummings, Attorney General).

Attorney General Cummings' letter clearly states the belief prevalent at the time the NSPA was passed—there was a need to federalize certain crimes in order to aid the states. *See McClain,* 545 F.2d at 994 citing *United States v. Sheridan,* 329 U.S. 379, 384, 67 S.Ct. 332, 334, 91 L.Ed. 359 (1946) and *United States v. Patten,* 345 F.Supp. 967, 968 (D.P.R.1972). *See also United States v. Roselli,* 432 F.2d 879, 891 (9th Cir. 1970); *United States v. Ludwig,* 523 F.2d 705, 707 (8th Cir. 1975), *cert. denied,* 423 U.S. 1076, 96 S.Ct. 861, 47 L.Ed.2d 86 (1976). Indeed, the greatest opposition to the NSPA came from those who feared the extension of federal criminal jurisdiction and were opposed to federalizing local crimes. In addition, at no time was it suggested that the 1934 statute should be applicable to anything other than tangible property that was stolen, converted, or taken by fraud as those terms were, and are, commonly used and understood. "Although

---

merce among the several States, should not provide that such commerce should not be polluted by the carrying of stolen property from one State to another. Congress is the only power competent to legislate upon this evil, and the purpose of this bill is to crush it, with the penalties attached."
*Turley,* 77 S.Ct. at 401 n. 13.

# 246

the Government refers to passages in the legislative history where the proponents of [the NSPA] ... expressed an intention to cover 'all property,' appellant relies on the same history to show that Congress was aiming at the kind of property normally the subject of theft by gangsters and racketeers. Under such circumstances, we must give the words actually used their ordinary meaning." *In re Vericker*, 446 F.2d at 248.

Consequently, the legislative history of the 1934 NSPA fails to provide necessary evidence that Congress was aware of the statute's claimed scope. *See Williams*, —— U.S. at ——, 102 S.Ct. at 3093. Indeed, copyrights and copyright infringement were never mentioned in the legislative history of the NSPA. Of course, there would be no need for Congress to utilize the commerce clause in order to gain jurisdiction over activities involving copyrights. The United States Constitution, Article I, section 8, clause 8, grants Congress jurisdiction over copyright activity, and Congress had been utilizing the authority for several years prior to the 1934 NSPA. Copyright infringing activity was already federalized and controlled with specific legislation. If Congress really intended to enact a statute broad enough to encompass copyright infringement, "it did so with a peculiar choice of language and in an unusually backhanded manner. [The NSPA] was not necessary to interdict [the interstate infringement of copyrights], for, as Congress surely knew, [copyright infringement] already [was] ad-

dressed in comprehensive fashion by [other federal] law." *Williams*, —— U.S. at ——, 102 S.Ct. at 3093. Consequently, the "legislative history does not demand a broader reading of the statute" than the statutory language apparently requires. *Id.*[19]

This Court's analysis of the NSPA's statutory language and legislative history is bolstered by an examination of the Copyright Act of 1976. While the only question before the Court is whether the felony provisions of section 2314 encompass copyright infringing activity, analysis of the 1976 Copyright Act—together with its legislative history—is helpful in demonstrating that the Government's position in the case *sub judice* is ill conceived, and Congress could not have intended for the 1934 NSPA to be so broad.[20]

The most striking lesson to be learned from the passage of the 1976 Copyright Act is Congress' obvious refusal to allow copyright infringing activity to be punished by felony provisions. To be sure, such provisions are an integral part of section 2314 and precisely the reason the Government chose to prosecute defendant Smith under the NSPA. Equally striking is the fact that the 1976 Copyright Act makes no distinction between copyright infringing activity that implicates interstate commerce or is purely intrastate in nature.[21] Of course, the interstate nature of the wrongful activity is the element that gives life to section 2314; it was the element that prompted Congress to federalize many local crimes.

**19.** The Court notes that, if § 2314 were read as the Government urges, the statute conceivably could make a surprisingly broad range of conduct a violation of federal law. Consequently, this Court avoids such an interpretation in order to follow the lesson of the Supreme Court in the case of *Williams*, —— U.S. at —— – ——, 102 S.Ct. at 3092–3093.

**20.** This Court is not determining that the 1976 Copyright Act impliedly repeals the 1934 NSPA. It is simply demonstrating that Congress' treatment of copyrights and copyright infringement demonstrates it has never considered copyright infringing activity to fall within the purview of the NSPA.

**21.** The Copyright Act of 1976 does not recognize the use of interstate commerce as a characteristic that would distinguish certain copy-

right infringing activities from others and, as a result, render them susceptible to felony punishment. The Copyright Act addresses *all* copyright infringement—whether it implicates interstate or foreign commerce—or whether it is completely intrastate. To illustrate, cable transmission and its interstate and foreign capabilities are mentioned throughout the Copyright Act, and Section 501 contemplates the importation of copies or phonorecords into the United States. The significance of the Act's language regarding importation and cable transmission is that Congress expressly addressed the problems of interstate and foreign commerce, but made no mention of why or how these problems should be punished differently than intrastate activity.

Nevertheless, the Copyright Act of 1976 was intended to be a comprehensive treatment and revision of the copyright laws. Copyright law in existence prior to passage of the 1976 Act was essentially that enacted by Congress in 1909. Congress recognized that developments in technology and communication rendered the 1909 law "clearly inadequate to the needs of the country." Both the Senate and House Reports set out in detail the extent of research and study that took place in order to provide for the general and extensive revision of the law. This research and study essentially began in 1955 and was ongoing throughout the next 20 years, ultimately resulting in the Copyright Act of 1976. Significantly, the NSPA's interstate commerce and felony punishment provisions were not mentioned in the reports.

The resulting Copyright Act of 1976 addressed congressional concerns regarding technological advancements and developments.[22] The problem of pirating copyrighted works through technological advances—the precise activity of defendant Smith—was specifically articulated to Congress on more than one occasion. Jack Valenti, the President of the Motion Picture Association of America, Inc. and the Association of Motion Picture and Television Producers, Inc. stated to the House Committee on the Judiciary:

> The bill provides that a first offender who pirates certain copyrighted material for profit (section 506, page 49), or who knowingly transports in commerce copyrighted material with a forged or counterfeited label (section 2318, page 64), may be imprisoned for not more than one year. A second or subsequent offender may be sentenced for up to two years imprisonment. A first offender can be charged under either section only with a misdemeanor—even though that offender has pirated thousands or hundreds of thousands of dollars of copyrighted material. These types of offenses are serious

and are felonious in nature, and should thus be accorded the stature and consideration of other felony statutes.

> We agree fully with the Department of Justice in its testimony to this committee that pirating of copyrighted works has become a major and serious problem. Consequently, convicted offenders should be subject to appropriate terms of imprisonment.

> We also agree with this Judiciary Committee's statement in its Report last year on the copyright extension and piracy bill. Film piracy and counterfeit labeling are "economic" offenses, as the Report declared. But the Committee must also recognize that the statutes protect a constitutionally recognized right. Such "economic" crimes as embezzlement are subject to greater imprisonment penalties in federal statutes. Similarly, while antitrust violations are "economic" offenses, only last year Congress increased the antitrust imprisonment penalty to three years.

> The piracy and counterfeit labeling penalties for imprisonment should be increased so that such offenses are classified as felonies and treated on an equal footing with similar "economic" offenses. *We therefore urge that a first offender under either section 506 or section 2318 be subject to a maximum of three years imprisonment and a second or subsequent offender be subject to a seven year sentence.*

*Omnibus Copyright Revision: Hearings Before the Subcommittee on Courts, Civil Liberties and the Administration of Justice of the House Committee on the Judiciary*, 94th Cong., 1st Sess. 716 (1975) (statement of Jack Valenti) (emphasis in original).

Without question, Congress was aware of the problem of film piracy, which resulted from recent developments in technology. To a large extent, the relatively new forms of piracy were considered to be a problem

---

**22.** To illustrate, there was substantial discussion and consideration of the problems resulting from the growth of cable systems. Accordingly, the 1976 enactment responded to con-

cerns such as the nonsimultaneous secondary transmission of cable systems. *See* Copyright Act of 1976, § 111(e).

because there apparently was no effective mechanism for combatting them. The 1934 NSPA obviously was not considered an appropriate mechanism. Accordingly, Congress was specifically requested to provide felony punishment to curb the problem. This request made no distinction between film piracy involving interstate or foreign commerce and piracy that was strictly intrastate. In any event, the relevant Senate Committee provided felony provisions in its version of the Act,[23] while the House version provided only for fines and misdemeanor terms of imprisonment. A final version of the Act, which resulted from a Conference Committee, rejected the specifically requested felony provisions and incorporated the House version's misdemeanor provisions.

This Court recognizes, of course, that it is conceivable Congress intended to keep interstate commerce clean without regard to whether it was being tainted by copyright infringement or otherwise. In other words, this Court can conceive of a congressional intention to address an evil separate and apart from the solitary evil of copyright infringement. That evil would be the pollution of interstate commerce by transporting illegally obtained property—including copyrighted material distributed in violation of the law. However, such analysis is problematic in the context of the instant case, since the legislative history of the Copyright Act demonstrates the pirating of copyrighted works through technological advances was specifically considered and addressed by the Copyright Act. It was in this specific and particular context of copyrights that Congress chose not to distinguish between copyright infringement im-

plicating interstate or intrastate commerce and chose not to invoke felony provisions.

This analysis is supported by Congress' recent assault on the pirating of copyrighted works. On May 24, 1982, the President signed into law the Piracy and Counterfeiting Amendments Act of 1982. Pub.L.No. 97–180, 96 Stat. 91 (1982). This Piracy Act provides a graduated punishment scheme for various copyright infringing activities, including distribution in violation of a copyright owner's exclusive rights.[24] The purpose of the act is to "strengthen the laws against record, tape, and film piracy and counterfeiting" by "increas[ing] the penalties for trafficking in counterfeit labels for copyrighted records, tapes, and audiovisual works and for copyright infringements involving such products." S.Rep.No. 97–274, 97th Cong., 1st Sess. 1 (1981), *reprinted in* 4 U.S.Code Cong. & Ad.News '82 127.

The necessity for these increased punishment provisions was Congress' apparent belief that no felony punishment provisions applied to copyright infringing activities, including the interstate trafficking of pirated works. Congressman Kastenmeier, Chairman of the House Subcommittee on Courts, Civil Liberties and the Administration of Justice explained that "only through penalties such as those provided in [the Piracy Act] can the law deter the sophisticated criminals who have created an industry in the illegal reproduction and distribution of motion pictures, records and tapes." —— Cong.Rec. H1951, 1300 (daily ed. May 10, 1982) (remarks of Rep. Kastenmeier). Representative Kastenmeier's explanation was underscored by numerous statements by other officials, including numerous mem-

---

**23.** The Senate version of the 1976 Copyright Act made criminal copyright infringement involving a sound recording or a motion picture a felony punishable by a fine not to exceed $25,-000.00 or imprisonment for not more than three years, or both, for the first offense. For any subsequent offense, the punishment was a fine of not more than $50,000.00 or imprisonment for not more than 7 years, or both. Once again, it is significant to note that the Senate's provisions for felony punishment did not distinguish between copyright infringement involv-

ing interstate or foreign commerce and strictly intrastate violations.

**24.** The penalties vary depending upon the number of copies produced or distributed in a given period of time, and the type of copyrighted work implicated. The punishment for producing or distributing 65 or more copies of motion pictures or audio visual works within a 180 day period is the most severe punishment. In such a situation, the infringer could receive a penalty of up to 5 years incarceration and/or a $250,000.00 fine.

bers of Congress and Renee L. Szybala, a special assistant to the Associate Attorney General of the United States. Szybala stated that "experience has shown that the misdemeanor penalties now available [under the Copyright Act of 1976] have done very little to either stem the tide of this type of offense or to encourage prosecutors to prosecute for it. We believe that the enhanced penalties that this bill provides would bring the sanctions for the crime more in line with the seriousness of it. With vigorous enforcement, the substantially increased penalty should act as a deterrent to major violators." *The Piracy and Counterfeiting Amendments Act of 1981— S.691: Hearings on S.691 Before the Subcommittee on Criminal Law of the Senate Committee on the Judiciary*, 97th Cong., 1st Sess. 8 (1981) (statement of Renee L. Szybala Special Assistant to the Associate Attorney General, Department of Justice). She also stated:

> Experience has shown, however, that the meager penalties under existing law appear to have had little deterrent effect in this area. The World Intellectual Property Organization, an intergovernmental group sponsored by the United Nations, has estimated that worldwide sales in pirated sound recordings totalled $1.1 billion in 1980 * * *. Yet the present criminal sanctions for a first offense involving copyright infringement of a sound recording or motion picture is a misdemeanor and carries a fine of not more than $25,-000.00.

*Id.* at 15–16.

This recent Congressional activity in the area of copyright infringement demonstrates Congress felt a significant need to provide more stringent punishment for various forms of infringement. The specific 1976 Copyright Act, although a comprehensive revision of copyright law, failed to provide the necessary punitive measures. Of course, the Piracy and Counterfeiting Amendments Act of 1982 would have been unnecessary if the NSPA section 2314— which provides for $10,000 fines and/or 10 years imprisonment—were available.

The legislative history of the NSPA section 2314—together with the lessons to be learned from passage of the 1976 Copyright Act and the recent Piracy Act—provide no basis for this Court to find the activity of defendant Smith to be in conflict with the provisions of section 2314. Indeed, a contrary result is mandated. Of course, this is consistent with a logical and common sense reading of the NSPA's statutory language. It would be a major encroachment upon Congress' lawmaking prerogative to say the activity falls within section 2314.[25]

## IV. *Conclusion*

This Court determines that the warrant challenged by defendant Smith was not an invalid general warrant. However, it determines the district court erred by entering a judgment that held defendant Smith's activity violated the NSPA section 2314. This Court, therefore, reverses defendant Smith's convictions and resulting sentences under the NSPA section 2314.

AFFIRMED IN PART, REVERSED IN PART.

---

**25.** At most, there is ambiguity regarding Congress' intention in this specific case. Accordingly, this Court is compelled to read § 2314 narrowly. Such a reading is consistent with the usual approach to construction of criminal statutes. The Supreme Court has emphasized that " 'when [a] choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.' " *Williams*, —— U.S. at

——, 102 S.Ct. at 3093, quoting *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971), quoting *United States v. Universal C. I. T. Credit Corporation*, 344 U.S. 218, 221–22, 73 S.Ct. 227, 229–230, 97 L.Ed. 260 (1952). *See also Whalen v. United States*, 445 U.S. 684, 100 S.Ct. at 1440 n.10, 63 L.Ed.2d 715, quoting *Ladner v. United States*, 358 U.S. 169, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958); *McClain*, 545 F.2d at 995 quoting *Rewis v. United States*, 401 U.S. 808 (1971); *Merrill*, 338 F.2d at 770.