**UNITED STATES of America, Plaintiff,**

v.

**Robert J. RIGGS, also known as Robert Johnson, also known as Prophet, and Craig Neidorf, also known as Knight Lightning, Defendants.**

No. 90 CR 0070.

United States District Court,
N.D. Illinois, E.D.

June 5, 1990.

Ira H. Raphaelson, Acting U.S. Atty. by William J. Cook, Colleen D. Coughlin, David Glockner, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Sheldon T. Zenner, Ted S. Helwig, Daniel A. Kaufman, Kenneth M. Kliebard, Katten Muchin & Zavis, Chicago, Ill., for defendants.

## MEMORANDUM ORDER

BUA, District Judge.

Over the course of the past decade, advances in technology and growing respect and acceptance for the powers of computers have created a true explosion in the computer industry. Quite naturally, the growth of computer availability and application has spawned a host of new legal issues. This case requires the court to wrestle with some of these novel legal issues which are a product of the marriage between law and computers.

The indictment charges that defendants Robert J. Riggs and Craig Neidorf, through the use of computers, violated the federal wire fraud statute, 18 U.S.C. § 1343, and the federal statute prohibiting interstate transportation of stolen property, 18 U.S.C. § 2314. Neidorf argues that the wire fraud statute and the statute prohibiting interstate transportation of stolen property do not apply to the conduct with which he is charged. Therefore, he has moved to dismiss the charges against him, as set forth in Counts II–IV of the indictment, which are based on those statutes.[1] Neidorf has also filed various other pretrial motions. For the reasons stated herein, Neidorf's motions are denied.

## I. THE INDICTMENT

### A. Factual Allegations

In about September 1988, Neidorf and Riggs devised and began implementing a scheme to defraud Bell South Telephone Company ("Bell South"), which provides telephone services to a nine-state region including Alabama, Georgia, Mississippi, Tennessee, Kentucky, Louisiana, North Carolina, South Carolina, and Florida. The objective of the fraud scheme was to steal Bell South's computer text file [2] which con-

---

1. The current indictment also contains three counts—V, VI, and VII—which set forth charges against Neidorf for violations of § 1030(a)(6)(A) of the Computer Fraud and Abuse Act of 1986, 18 U.S.C. § 1030(a)(6)(A). Although Neidorf also moves to dismiss those counts, the government has indicated that it is in the process of drafting a superseding indictment which may not contain any charges under the Computer Fraud and Abuse Act of 1986. Therefore, the court will reserve its ruling on Neidorf's motion to dismiss Counts V, VI, and VII until the su-

perseding indictment is filed. The court will also reserve its ruling on Neidorf's motion for a bill of particulars, which by its terms pertains only to Counts V, VI, and VII.

2. A "computer text file" is a collection of stored data which, when retrieved from a disk or other computer storing device, presents typed English characters on a computer monitor, a printer, or other medium compatible with the computer storing the data.

tained information regarding its enhanced 911 (E911) system for handling emergency calls to policy, fire, ambulance, and other emergency services in municipalities. The text file which Riggs and Neidorf planned to steal specifically details the procedures for installation, operation, and maintenance of E911 services in the region in which Bell South operates. Bell South considered this file to contain valuable proprietary information and, therefore, closely guarded the information from being disclosed outside of Bell South and its subsidiaries. Riggs and Neidorf wanted to obtain the E911 text file so it could be printed in a computer newsletter known as "PHRACK" which Neidorf edited and published.

In about December 1988, Riggs began the execution of the fraud scheme by using his home computer in Decatur, Georgia, to gain unlawful access to Bell South's computer system located at its corporate headquarters in Atlanta, Georgia. After gaining access to Bell South's system, Riggs "downloaded"[3] the text file, which described in detail the operation of the E911 system in Bell South's operating region. Riggs then disguised and concealed his unauthorized access to the Bell South system by using account codes of persons with legitimate access to the E911 text file.

Pursuant to the scheme he had devised with Neidorf, Riggs then transferred the stolen computer text file to Neidorf by way of an interstate computer data network. Riggs stored the stolen text file on a computer bulletin board system[4] located in Lockport, Illinois, so as to make the file available to Neidorf. The Lockport bulletin board system was used by computer "hackers"[5] as a location for exchanging and developing software tools and other information which could be used for unauthorized intrusion into computer systems. Neidorf, a twenty-year-old student at the University of Missouri in Columbia, Missouri, used a computer located at his school to access the Lockport computer bulletin board and thereby receive the Bell South E911 text file from Riggs. At the request of Riggs, Neidorf then edited and retyped the E911 text file in order to conceal the fact that it had been stolen from Bell South. Neidorf then "uploaded"[6] his revised version of the stolen file back onto the Lockport bulletin board system for Riggs' review. To complete the scheme, in February 1989, Neidorf published his edited edition of Bell South's E911 text file in his PHRACK newsletter.

### B. Charges

The current indictment asserts seven counts. Count I charges that Riggs committed wire fraud in violation of 18 U.S.C. § 1343 by transferring the E911 text file from his home computer in Decatur, Georgia to the computer bulletin board system in Lockport, Illinois. Count II charges both Riggs and Neidorf with violating § 1343 by causing the edited E911 file to be transferred from a computer operated by Neidorf in Columbia, Missouri, to the computer bulletin board system in Lockport, Illinois. Counts III and IV assert that by transferring the E911 text file via

3. "Downloading" is the process of transferring files, programs, or other computer-stored information from a remote computer to one's own computer. *See* Note, *Computer Bulletin Board Operator Liability for User Misuse*, 54 Fordham L.Rev. 439, 439 n. 2 (1988). "Uploading" is the reverse process, *i.e.*, transferring computer-stored data from one's own computer to a remote computer. *Id.*

4. A computer bulletin board system is a computer program that simulates an actual bulletin board by allowing computer users who access a particular computer to post messages, read existing messages, and delete messages. The messages exchanged may contain a wide variety of information, including stolen credit card numbers, confidential business information, and information about local community events. *See* Note, *Computer Bulletin Board Operator Liability for User Misuse*, 54 Fordham L.Rev. 439, 439–41 & nn. 1–11 (1988); *see also* Jensen, *An Electronic Soap Box: Computer Bulletin Boards and the First Amendment*, 39 Fed.Com.L.J. 217 (1987); Morrison, *Electronic Bulletin Board System Prover BBS*, 13 Legal Econ. 44 (1987); Soma, Smith & Sprague, *Legal Analysis of Electronic Bulletin Board Activities*, 7 W. New Engl. L.Rev. 571 (1985).

5. For a discussion of the definition of "hackers," see Part II, Subpart C, *infra*.

6. *See supra* note 2.

an interstate computer network, Riggs and Neidorf violated the National Stolen Property Act, 18 U.S.C. § 2314, which prohibits interstate transfer of stolen property. Finally, Counts V–VII charge Riggs and Neidorf with violating § 1030(a)(6)(A) of the Computer Fraud and Abuse Act of 1986, 18 U.S.C. § 1030(a)(6)(A), which prohibits knowingly, and with intent to defraud, trafficking in information through which a computer may be accessed without authorization.

## II. DISCUSSION

### A. Motion to Dismiss Count II

 Neidorf claims that Count II of the indictment is defective because it fails to allege a scheme to defraud, one of the necessary elements for a wire fraud claim under 18 U.S.C. § 1343. *See Lombardo v. United States*, 865 F.2d 155, 157 (7th Cir.) (holding that the two elements of a wire fraud claim under § 1343 are a scheme to defraud and the use of wire communications in furtherance of the scheme), *cert. denied*, —— U.S. ——, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989). All Count II charges, says Neidorf, is that he received and then transferred a computer text file, not that he participated in any scheme to defraud.

Unsurprisingly, Neidorf's reading of the indictment is self-servingly narrow. The indictment plainly and clearly charges that Neidorf and Riggs concocted a fraud scheme, the object of which was to steal the E911 text file from Bell South and to distribute it to others via the PHRACK newsletter. The indictment also clearly alleges that both Riggs and Neidorf took action in furtherance of the fraud scheme. Riggs allegedly used fraudulent means to access Bell South's computer system and then disguised his unauthorized entry. Neidorf allegedly furthered the scheme by redacting from the E911 text file references to Bell South and other information which would reveal the source of the E911 file, transmitting the redacted file back to the Lockport bulletin board for Riggs review, and publishing the redacted text file in the PHRACK newsletter for others' use. Moreover, both Neidorf and Riggs alleg-

edly used coded language, code names, and other deceptive means to avoid the detection of their fraud by law enforcement officials. These allegations sufficiently set forth the existence of a scheme to defraud, as well as Neidorf's participation in the scheme. *See McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 2880–81, 97 L.Ed.2d 292 (1987) (where the Court, quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924), held that "to defraud" as used in the mail fraud statute simply means "wronging one in his property rights by dishonest methods or schemes" usually by "the deprivation of something of value by trick, deceit, chicane, or overreaching"); *see also Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 320–21, 98 L.Ed.2d 275 (1987) (applying *McNally* to the wire fraud statute, the Court held that a Wall Street Journal columnist participated in a scheme to defraud chargeable under § 1343 where he executed a plan under which he disclosed confidential financial information to an investor in exchange for a share of the investor's profits from that information).

 Neidorf also argues that Count II is deficient because it fails to allege that he had a fiduciary relationship with Bell South. To support this position, Neidorf relies on cases such as *United States v. Richter*, 610 F.Supp. 480 (N.D.Ill.1985), and *United States v. Dorfman*, 532 F.Supp. 1118 (N.D.Ill.1981). In each of those cases, as well as other similar cases cited by Neidorf, the court held that where a wire fraud charge is based on the deprivation of an intangible right, such as the right to honest and fair government or the right to the loyal service of an employee, the government must allege the existence of a fiduciary relationship between the defendant and the alleged victim to state a charge under § 1343.

In the instant case, however, the wire fraud charge is not based on the deprivation of an intangible right. The government charges Riggs and Neidorf with scheming to defraud Bell South out of *property*—the confidential information

contained in the E911 text file. The indictment specifically alleges that the object of defendants' scheme was the E911 text file, which Bell South considered to be valuable, proprietary, information. The law is clear that such valuable, confidential information is "property," the deprivation of which can form the basis of a wire fraud charge under § 1343. *See Carpenter*, 108 S.Ct. at 320; *see also United States v. Keane*, 852 F.2d 199, 205 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989). Therefore, Neidorf's argument misconstrues the wire fraud charge against him. Cases such as *Richter* and *Dorfman* are wholly inapposite.[7]

■ As further support for his argument that fiduciary relationship between himself and Bell South must be alleged to state a wire fraud charge against him, Neidorf analogizes his role in the alleged scheme to that of an "innocent tippee" in the securities context, such as the defendants in *Dirks v. Securities Exchange Commission*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), and *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). This analogy, however, is fallacious. Those cases involved individuals who come upon information *lawfully;* the question in each of those cases was whether, once possessing that information, the individual had a duty to disclose it. In the instant case, in contrast, Neidorf is alleged to have planned and participated in the scheme to defraud Bell South. Although Riggs allegedly was the one who actually stole the E911 text file from Bell South's computer system, the government alleges that Neidorf was com-

pletely aware of Riggs' activities and agreed to help Riggs conceal the theft to make the fraud complete. Therefore, in no way can Neidorf be construed as being in a similar situation to the innocent tippees in *Dirks* and *Chiarella*.[8] As a result, the court rejects his argument that Count II is defective for failing to allege a fiduciary duty between himself and Bell South. Neidorf's motion to dismiss Count II is accordingly denied.

## B. Motion to Dismiss Counts III and IV

Counts III and IV charge Riggs and Neidorf with violating 18 U.S.C. § 2314, which provides, in relevant part:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

The government concedes that charging Neidorf under § 2314 plots a course on uncharted waters. No court has ever held that the electronic transfer of confidential, proprietary business information from one computer to another across state lines constitutes a violation of § 2314. However, no court has addressed the issue. Surprisingly, despite the prevalence of computer-related crime, this is a case of first impression. The government argues that reading § 2314 as covering Neidorf's conduct in this case is a natural adaptation of the statute to modern society. Conversely,

---

7. Moreover, to the extent that prior case law such as *Dorfman* and *Richter* held that a mail fraud or a wire fraud charge can be based on the deprivation of intangible rights so long as a fiduciary relationship exists between the victim and the defendant, those cases are no longer good law. The Supreme Court expressly rejected the notion that such a charge can be based on the deprivation of an intangible right—fiduciary relationship or not—in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *See Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987). The *McNally* Court ruled that a mail fraud charge must be based on the deprivation of *property*. *Id.* However, the property which

forms the basis for a wire fraud or mail fraud charge can be "intangible" property. *See Bateman v. United States*, 875 F.2d 1304, 1306 & n. 2 (7th Cir.1989); *see also United States v. Barber*, 881 F.2d 345, 348 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990). This distinction between intangible property and intangible rights has somewhat muddled the ruling in *McNally*. *Id.*

8. Similarly, the case of *United States v. Chestman*, 903 F.2d 75 (2d Cir.1990), which Neidorf submitted to the court in a supplemental brief, does not lend any support to Neidorf's position.

Neidorf contends that his conduct does not fall within the purview of § 2314 and that the government is seeking an unreasonable expansion of the statute. He urges the court to dismiss the charge on two grounds.

■ Neidorf's first argument is that the government cannot sustain a § 2314 charge in this case because the only thing which he allegedly caused to be transferred across state lines was "electronic impulses." Neidorf maintains that under the plain language of the statute, this conduct does not come within the scope of § 2314 since electronic impulses do not constitute "goods, wares, or merchandise."

The court is unpersuaded by Neidorf's disingenuous argument that he merely transferred electronic impulses across state lines. Several courts have upheld § 2314 charges based on the wire transfer of fraudulently obtained money, rejecting the arguments of the defendants in those cases that only electronic impulses, not actual money, crossed state lines. For example, in *United States v. Gilboe*, 684 F.2d 235 (2d Cir.1982), *cert. denied*, 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983), the court held, in affirming a § 2314 conviction based on the wire transfer of funds:

> The question whether [§ 2314] covers electronic transfers of funds appears to be one of first impression, but we do not regard it as a difficult one. Electronic signals in this context are the means by which funds are transported. The beginning of the transaction is money in one account and the ending is money in another. The manner in which the funds were moved does not affect the ability to obtain tangible paper dollars or a bank check from the receiving account. If anything, the means of transfer here were essential to the fraudulent scheme.

*Id.* at 238. Other circuits have followed the reasoning in *Gilboe*. *See United States v. Kroh*, 896 F.2d 1524, 1528–29 (8th Cir.1990); *United States v. Goldberg*, 830 F.2d 459, 466–67 (3d Cir.1987); *United States v. Wright*, 791 F.2d 133, 135–37 (10th Cir.1986); *see also United States v. Kenngott*, 840 F.2d 375, 380 (7th Cir.1987)

(citing *Gilboe* with approval). In all of these cases, the courts held that money was transferred across state lines within the meaning of § 2314 because funds were actually accessible in one account prior to the transfer, and those funds were actually accessible in an out-of-state account after the transfer. The courts refused to accept the superficial characterization of the transfers as the mere transmittal of electronic impulses.

Similarly, in the instant case, Neidorf's conduct is not properly characterized as the mere transmission of electronic impulses. Through the use of his computer, Neidorf allegedly transferred proprietary business information—Bell South's E911 text file. Like the money in the case dealing with wire transfers of funds, the information in the E911 text file was accessible at Neidorf's computer terminal in Missouri before he transferred it, and the information was also accessible at the Lockport, Illinois computer bulletin board after Neidorf transferred it. Therefore, under *Gilboe*, *Kroh*, *Wright*, and *Goldberg*, the mere fact that the information actually crossed state lines via computer-generated electronic impulses does not defeat a charge under § 2314.

■ The question this case presents, then, is not whether electronic impulses are "goods, wares, or merchandise" within the meaning of § 2314, but whether the proprietary information contained in Bell South's E911 text file constitutes a "good, ware, or merchandise" within the purview of the statute. This court answers that question affirmatively. It is well-settled that when proprietary business information is affixed to some tangible medium, such as a piece of paper, it constitutes "goods, wares, or merchandise" within the meaning of § 2314. *See United States v. Greenwald*, 479 F.2d 320, 322 (6th Cir.) (documents containing valuable chemical formulae are "goods, wares, or merchandise" under § 2314), *cert. denied*, 414 U.S. 854, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973); *United States v. Bottone*, 365 F.2d 389, 393 (2d Cir.) (copies of documents describing a manufacturing process of patented drugs

constitute a "good" under § 2314), *cert. denied*, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966); *United States v. Lester*, 282 F.2d 750, 754–55 (3d Cir.1960) (copies of geophysical maps identifying oil deposits come within the purview of § 2314), *cert. denied*, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961); *United States v. Seagraves*, 265 F.2d 876 (3d Cir.1959) (same facts as in *Lester*).

Therefore, in the instant case, if the information in Bell South's E911 text file had been affixed to a floppy disk, or printed out on a computer printer, then Neidorf's transfer of that information across state lines would clearly constitute the transfer of "goods, wares, or merchandise" within the meaning of § 2314. This court sees no reason to hold differently simply because Neidorf stored the information inside computers instead of printing it out on paper. In either case, the information is in a transferrable, accessible, even salable form.

Neidorf argues in his brief that a § 2314 charge cannot survive when the "thing" actually transferred never takes tangible form. A few courts have apparently adopted this position.[9] For example, in *United States v. Smith*, 686 F.2d 234 (5th Cir.1982), the court held that a copyright does not fit within the definition of "goods, wares, or merchandise" under § 2314. The court ruled that in order to come within that definition, "[t]he 'thing' or 'item' must have some sort of tangible existence; it must be in the nature of 'personal property or chattels.'" *Id.* at 241. Similarly, in *Bottone, supra*, where the court held that copies of documents describing a manufacturing process for a patented drug constitute "goods, wares, or merchandise" under § 2314, the court opined:

> To be sure, where no tangible objects were ever taken or transported, a court would be hard pressed to conclude that "goods" had been stolen and transported within the meaning of § 2314; the stat-

ute would presumably not extend to the case where a carefully guarded secret was memorized, carried away in the recesses of a thievish mind and placed in writing only after a [state] boundary had been crossed.

365 F.2d at 393.

Nevertheless, this court is not entirely convinced that tangibility is an absolute requirement of "goods, wares, or merchandise" under § 2314. Congress enacted § 2314 to extend the National Motor Vehicle Theft Act to cover all stolen property over a certain value ($5000) which is knowingly transported across state lines. *See Dowling v. United States*, 473 U.S. 207, 218–20, 105 S.Ct. 3127, 3133–35, 87 L.Ed.2d 152 (1985). In line with this broad congressional intent, courts have liberally construed the term "goods, wares, or merchandise" as "a general and comprehensive designation of such personal property and chattels as are ordinarily the subject of commerce." *See United States v. Whaley*, 788 F.2d 581, 582 (9th Cir.) (quoting *Seagraves*, 265 F.2d at 880), *cert. denied*, 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986). Reading a tangibility requirement into the definition of "goods, wares, or merchandise" might unduly restrict the scope of § 2314, especially in this modern technological age. For instance, suppose the existence of a valuable gas, used as an anesthetic, which is colorless, odorless, and tasteless—totally imperceptible to the human senses. If this gas is stored in a tank in Indiana, and a trucker hooks up to the tank, releases the valuable gas into a storage tank on his truck, and then takes the gas to Illinois to sell it for a profit, is there no violation of § 2314 simply because the gas is not technically tangible? This court is reluctant to believe that any court would construe § 2314 so narrowly.

In any event, this court need not decide that issue to resolve this case, for even if tangibility is a requirement of "goods,

---

9. Although, contrary to Neidorf's arguments, neither the Supreme Court's decision in *Dowling v. United States*, 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985), nor the Seventh Circuit's decision in *United States v. Kenngott*, 840 F.2d 375 (7th Cir.1987), stand for the proposition that only tangible objects fall within the definition of "goods, wares, or merchandise" under § 2314. The definition of the term "goods, wares, or merchandise" was not even at issue in either of those cases.

wares or merchandise" under § 2314, in this court's opinion the computer-stored business information in this case satisfies that requirement. Although not printed out on paper, a more conventional form of tangibility, the information in Bell South's E911 text file was allegedly stored on computer. Thus, by simply pressing a few buttons, Neidorf could recall that information from computer storage and view it on his computer terminal. The information was also accessible to others in the same fashion if they simply pressed the right buttons on their computer. This ability to access the information in viewable form from a reliable storage place differentiates this case from the mere memorization of a formula and makes this case more similar to cases like *Greenwald, Bottone, Seagraves,* and *Lester,* where proprietary information was also stored, but in a more traditional manner—on paper. The accessibility of the information in readable form from a particular storage place also makes the information tangible, transferable, salable and, in this court's opinion, brings it within the definition of "goods, wares, or merchandise" under § 2314.

 In order to sustain a charge against Neidorf under § 2314, however, the government cannot simply allege that Neidorf transferred "goods, wares, or merchandise" across state boundaries; the government must also allege that Neidorf executed the transfer knowing the goods were "stolen, converted or taken by fraud." This requirement forms the basis for Neidorf's second challenge to Counts III and IV. Relying on *Dowling v. United States,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985), Neidorf maintains that the § 2314 charges should be dismissed because the "things" he allegedly transferred are not the type of property which is capable of being "stolen, converted or taken by fraud."

In *Dowling,* the government charged the defendant with violating § 2314 by shipping "bootleg" and "pirated" [10] phonorec-

ords across state lines. *Id.* at 212, 105 S.Ct. at 3130–31. The government argued that the shipments came within § 2314 because the phonorecords embodied performances of copyrighted musical compositions which the defendant had no right to distribute. *Id.* at 214–15, 105 S.Ct. at 3131–32. The Court framed the issue in the case as follows:

> Dowling does not contest that he caused the shipment of goods in interstate commerce, or that the shipments had sufficient value to meet the monetary requirement. He argues, instead, that the goods shipped were not "stolen, converted or taken by fraud."
>
> \*　\*　\*　\*　\*　\*
>
> We must determine, therefore, whether phonorecords that include the performance of copyrighted musical compositions for the use of which no authorization has been sought or royalties paid are consequently "stolen, converted or taken by fraud" for purposes of § 2314.

*Id.* at 214–16, 105 S.Ct. at 3131–32. The Court ruled that while the holder of a copyright possesses certain property rights which are protectible and enforceable under copyright law, he does not own the type of possessory interest in an item of property which may be "stolen, converted or taken by fraud." *Id.* at 216–18, 105 S.Ct. at 3132–34. Thus, the Court held that § 2314 does not apply to interstate shipments of "bootleg" and "pirated" phonorecords whose unauthorized distribution infringes on valid copyrights. *Id.* at 228–29, 105 S.Ct. at 3138–39.

Neidorf also cites *United States v. Smith,* 686 F.2d 234 (5th Cir.1982), to support his argument. Like *Dowling, Smith* held that copyright infringement is not the equivalent of theft or conversion under § 2314. *Id.* at 241. The instant case, however, is distinguishable from *Dowling* and *Smith.* This case involves the transfer of confidential, proprietary business information, not copyrights. As *Dowling* and *Smith* recognized, the copyright holder

---

10. A "bootleg" phonorecord is an unauthorized copy of a commercially unreleased performance. A "pirated" phonorecord is an unauthorized copy of a performance already commercially released. *Dowling,* 473 U.S. at 209–10 n. 2, 105 S.Ct. at 3129 n. 2.

owns only a bundle of intangible rights which can be infringed, but not stolen or converted. The owner of confidential, proprietary business information, in contrast, possesses something which has clearly been recognized as an item of *property*. *Carpenter*, 108 S.Ct. at 320; *Keane*, 852 F.2d at 205. As such, it is certainly capable of being misappropriated, which, according to the indictment, is exactly what happened to the information in Bell South's E911 text file.

█ In his final gasp, Neidorf points out that in *Dowling*, the Court based its ruling partly on the fact that Congress passed the Copyright Act to deal exclusively with copyright infringements. The Court reasoned that applying § 2314 to the infringement of copyrights would result in an unnecessary and unwarranted intrusion into an area already governed by the Copyright Act. 473 U.S. at 221–26, 105 S.Ct. at 3135–38. Neidorf makes a similar argument in this case. He notes that Congress has enacted a statute—the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030—which is specifically designed to address computer-related crimes, such as unauthorized computer access. Neidorf claims that the enactment of the CFAA precludes a finding that § 2314 reaches his alleged conduct in this case.

The problem with Neidorf's argument, however, is that he does not cite, and this court is unable to find, anything in the legislative history of the CFAA which suggests that the statute was intended to be the exclusive law governing computer-related crimes, or that its enactment precludes the application of other criminal statutes to computer-related conduct. Therefore, the court rejects Neidorf's claim that applying § 2314 to the instant case would undermine the Congressional intent behind the CFAA. Similarly, the court rejects Neidorf's bald assertion that the legislative history behind § 2314 supports his argument. Nothing in the legislative history of § 2314 prevents the court from finding that the information in Bell South's E911 text file was "stolen, converted or taken by fraud" as that term is used in

§ 2314. Accordingly, Neidorf's motion to dismiss Counts III and IV is denied.

### C. Motion to Strike Surplusage and Prejudicial Material

█ Pursuant to Rule 7(d) of the Federal Rules of Criminal .Procedure, Neidorf moves to strike certain words and phrases from the indictment which he claims are unnecessary and prejudicial. He first argues that the terms "hackers" and "computer hackers" should be stricken because those terms are likely to cause confusion and prejudice. He contends that the government uses those terms in the indictment to lure the jury into predetermining his character and motives.

The court, however, is not convinced that the government's use of the term "hacker" in this case is unduly prejudicial. The government has specifically defined "hackers" in the indictment as "individuals involved with the unauthorized access of computer systems by various means." This definition is consistent with *Webster's II New Riverside University Dictionary* (1984), which defines hacker as follows: *"Slang.* One who gains unauthorized, usu[ally] non-fraudulent access to another's computer system." *Id.* at 557. The term "hackers" has also been understood to encompass both those who obtain unauthorized access to computer systems and those who simply enjoy using computers and experimenting with their capabilities as "innocent" hobbyists. *See* Staff of the Subcomm. on Transportation, Aviation & Materials of the House Comm. on Science & Technology, 98th Cong., 2d Sess., Report on Computer & Communications Security & Privacy 17 (Comm. Print 1984) (citing the testimony of Donn B. Parker, Senior Management Systems Consultant, SRI International, Computer Research Institute, wherein he stated, "Computer hackers are hobbyists with intense interest in exploring the capabilities of computers and communications and causing these systems to perform to their limits.... Hackers exhibit a spectrum of behavior from benign to malicious."); *see also* C. Stoll, *The Cuckoo's Egg*, at 10 (1989) ("The word hacker has two very different meanings. The people I

knew who called themselves hackers were software wizards who ... knew all the nooks and crannies of the operating system.... But in common usage, a hacker is someone who breaks into computers"). However, as pointed out in *The Cuckoo's Egg*, and as is evident from a review of the modern articles using the term, the definition set forth in the indictment is the one most commonly employed.

The court finds that the use of the term "hackers" in the indictment does not unduly prejudice Neidorf; it is simply a succinct method of describing the alleged activities of the persons with whom Neidorf was associated during the time period charged in the indictment. The term is both relevant and material, and, contrary to Neidorf's claim that it will cause confusion, the term is likely to be somewhat helpful to the jury in understanding the charges in this case. Thus, the court refuses to strike the term "hackers" from the indictment. *See United States v. Chaverra–Cardona*, 667 F.Supp. 609, 611 (N.D.Ill. 1987) (information relevant to the charges and helpful to the jury's understanding of those charges should not be stricken from an indictment).

■ Neidorf also claims that references to the "Legion of Doom," a computer hacker group, should be deleted from the indictment. Neidorf, however, allegedly had close ties to the Legion of Doom and disseminated the E911 text file to some of its members. Therefore, references to the Legion of Doom are highly relevant to the charges in this case. Neidorf claims the name "Legion of Doom" "invites images of cult worshippers, satanism, terrorism or black magic," but this is a gross exaggeration of the potential effect of the term. The indictment clearly sets forth the purposes and activities of the group, none of which include the slightest reference to any type of satanism or the like. Thus, there is no reason to strike references to the "Legion of Doom."

■ Neidorf further contends that the court should strike the following portions of the indictment: (1) the second sentence of paragraph 8, which reads:

The Lockport [computer bulletin board system] was also used by computer hackers as a location for exchanging and developing software tools for computer intrusion, and for receiving and distributing hacker tutorials and other information.

(2) the underlined words in paragraph 21, which reads:

It was further part of the scheme that the defendants RIGGS and NEIDORF would publish information to other computer hackers which could be used to gain unauthorized access to emergency 911 computer systems in the United States and thereby disrupt or halt 911 service in portions of the United States.

and (3) the underlined parts of paragraph 3, which reads in part:

The E911 Practice was a highly proprietary and closely held computerized text file belonging to the Bell South Telephone Company and stored on the company's AIMSX computer in Atlanta, Georgia. The E911 Practice described the computerized control and maintenance of the E911 system and carried warning notices that it was not to be disclosed outside Bell South or any of its subsidiaries except under written agreement.

Each of these allegations, however, are directly relevant to Neidorf's knowledge of the proprietary, confidential nature of the information in Bell South's E911 file and to Neidorf's motive and ability to aid in the misappropriation of that information. Therefore, those allegations are pertinent to the elements of the offenses charged and are not properly stricken. Neidorf's motion to strike is accordingly denied.

*D. Motion For A Santiago Hearing*

■ In order to offer the statements of a defendant's alleged co-conspirators into evidence against the defendant pursuant to Fed.R.Evid. 801(d)(2)(E), the government must make a preliminary showing, by a preponderance of the evidence, that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy when the statements were made; and (3) the statements were made during the

course of and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1989); *United States v. Santiago*, 582 F.2d 1128, 1135 (7th Cir.1978). Neidorf has moved for an order requiring the government to file a statement setting forth its evidence in support of each of the above factors. The government, however, filed a *Santiago* proffer subsequent to Neidorf's motion. Therefore, Neidorf's motion for a *Santiago* proffer is denied as moot. Moreover, after reviewing the government's case as detailed in its proffer, the court finds that the government has set forth sufficient evidence to support a preliminary finding of the admissibility of the statements of Neidorf's alleged coconspirators. Therefore, this court will conditionally admit those statements, offered pursuant to Rule 801(d)(2)(E), subject to proof by a preponderance of the evidence at trial that the *Santiago* factors are satisfied.

### E. Motion For Discovery and Disclosure

█ In this motion, Neidorf asks the court to issue an order requiring the government to comply with seven specific discovery requests, which Neidorf labels A–G. In large part, Neidorf's motion is moot. The government responds that it has already complied with each of Neidorf's requests, or will soon turn over the information sought, with only one exception—the government objects to request "F." In that request, Neidorf seeks evidence of specific instances of misconduct which the government plans to offer for impeachment purposes.

The court finds that the government's refusal to comply with request "F" is justified, since the government has no obligation to turn over the impeachment evidence sought in that request. *See United States v. Braxton*, 877 F.2d 556, 560 (7th Cir.1989). Accordingly, Neidorf's motion for discovery and disclosure is denied.

### F. Motion For Immediate Disclosure of Favorable Evidence

Pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), Neidorf moves for an order requiring the government to disclose all evidence of which the government is aware that is favorable to him. Neidorf has made specific *Brady* and *Giglio* requests, which he has numbered 1–11.

█ The government responds that it has complied and will continue to comply with its obligation to turn over exculpatory evidence pursuant to *Brady*. However, the government has objected to Neidorf's Request No. 1, which seeks any information the government has regarding "any person whose testimony would be favorable to defendant in any way." The court agrees with the government that this request is too overbroad to fall within the scope of *Brady*. *See United States v. Robinson*, 585 F.2d 274, 281 (7th Cir.1978), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979). Therefore, the government's objection to that request is valid.

█ Neidorf acknowledges that the remainder of his requests seek material pursuant to *Giglio*. In Request No. 2, Neidorf seeks the statements of individuals which would contradict the testimony of any government witnesses, regardless of whether the government intends to call the individuals as witnesses. To the extent such information is not within the scope of *Brady*, however, it is not discoverable. *See United States v. Marquez*, 686 F.Supp. 1354, 1358 (N.D.Ill.1988); *see also United States v. Cole*, 453 F.2d 902, 904 (8th Cir.), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1788, 32 L.Ed.2d 122 (1972). Therefore, the government's objection to Request No. 2 is justified.

█ In Request No. 3, Neidorf seeks immediate disclosure of any documentary evidence which contradicts or is inconsistent with the expected testimony of any government witness. The government has objected to this request only to the extent that it demands such information immediately. This objection is clearly reasonable, since there is no requirement that *Giglio* material be produced well in advance of trial. *See United States v. Williams*, 738 F.2d 172, 178 (7th Cir.1984).

Requests Nos. 4 and 5 seek "the name, address, and statement ... of any individual who has been interviewed by the government who had knowledge of the activity alleged in the indictment" and "any and all books, papers, records, or documents which contain evidence favorable to defendant." Request 11 seeks "any illegal or unauthorized activity engaged in by government agents in connection with this indictment or related activity." The court agrees with the government that these requests are too vague and overbroad to fall within *Brady* or *Giglio*. *See Robinson*, 585 F.2d at 281.

Finally, the government objects to Requests 6–10 only to the extent that Neidorf seeks the material set forth in those requests immediately. As noted above, nothing requires the government to turn over *Giglio* evidence well in advance of trial. Accordingly, Neidorf's motion for immediate disclosure of favorable evidence is denied.

### G. Motion For Pretrial Production of Jencks Material

Neidorf's final motion requests the court to order the government to produce material pursuant to the Jencks Act, 18 U.S.C. § 3500, thirty or sixty days prior to trial.[11] By its express terms, the Jencks Act generally does not provide the defendant with an opportunity to obtain the statements of a government witness until after the witness has testified on direct examination. 18 U.S.C. § 3500(a). Neidorf, however, claims that he will not be able to adequately use the Jencks material unless it is provided to him in advance of trial. Therefore, he maintains that pretrial production of the Jencks material is required in order to afford him his rights to due process of law and to effective assistance of counsel.

In some cases, courts have held that pretrial production of Jencks materials is required in order to avoid long delays during trial and to provide the defendant with ample opportunity to review the material and make appropriate use of it. *See, e.g., United States v. Holmes*, 722 F.2d 37, 40–41 (4th Cir.1983); *United States v. Narciso*, 446 F.Supp. 252, 271 (E.D.Mich.1977). Those cases, however, are rare. They generally involve an overwhelming volume of Jencks material of a particularly complex nature. There is no indication that this case involves that type of complexity or volume. The court will assure that Neidorf's counsel has sufficient opportunity to review the Jencks material to be able to make substantive use of it, and the court is confident that providing Neidorf's counsel with that opportunity will not produce inordinate delays during trial. Therefore, Neidorf's constitutional rights to due process and effective assistance of counsel will not be implicated by the government's production of Jencks material at trial. Neidorf's motion for early production of that material is accordingly denied.

### CONCLUSION

For the foregoing reasons, Neidorf's pretrial motions are denied, except for his motion to dismiss Counts V–VII and his motion for a bill of particulars, which are held in abeyance pending the filing of the superseding indictment.

IT IS SO ORDERED.

---

11. Curiously, the first sentence of Neidorf's motion asks for production thirty days prior to trial, while the last sentence of the motion asks for production sixty days prior to trial.